**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DONALD PONTARELLI** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 C 1015 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **CAROLYN W. COLVIN** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Donald Pontarelli ("Plaintiff" or "Pontarelli") seeks judicial review of a final decision of Defendant Carolyn W. Colvin, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for benefits under the Social Security Act, and Pontarelli filed a Motion for Summary Judgment that seeks to reverse the Commissioner's decision. The Commissioner filed a cross-motion. For the reasons stated below, both motions are granted in part and denied in part.

## I. Legal Standard

### A. The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit

is realized."  20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims.  *See* 20 C.F.R. § 404.1520.  The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii).  At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings").  The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4.  20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work.  The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can do so, he is not disabled.  *Id.*  If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience.  An individual is not disabled if he can do work that is available under this standard.  20 C.F.R. § 404.1520(a)(4)(v).

2

## B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  <u>Background Facts</u>

## A.  Medical History

Pontarelli suffers from rapid-cycling bipolar disorder and, as of 2011, is recovering from polysubstance abuse.  He was hospitalized at the Reed Mental Health Clinic for nearly three weeks in September 2009.  (R. 297).  A treatment note from February 2010

states that he had experienced multiple earlier admissions to hospital and clinical settings for depression and suicide attempts. Pontarelli was hospitalized in February 2010 when he tried to kill himself by exposure to carbon dioxide. (R. 255, 265). The ALJ found that Plaintiff was again hospitalized at Alexian Brothers Hospital in July 2010.[1] (R. 16, 255-56).

The majority of Pontarelli's subsequent treatment took place at the Kenneth Young Center, where he was treated by psychiatrists Dr. Iveta Boyanchek and, after July 2010, by Dr. Jerry Gibbons. Both doctors treated Pontarelli with a variety of anti-anxiety, anti-psychotic, and anti-seizure medications used to treat bipolar disorder and anxiety. These included at various times Neurontin, Klonopin, Zyprexa, Lamictal, lithium carbonate, and Ativan. Plaintiff ordinarily took combinations of most of these medications each day. Dr. Gibbons and Dr. Boyanchek noted on several occasions that Pontarelli's symptoms stabilized on medication. (R. 319, 322, 328, 352, 361, 392, 403, 405, 457, 459). Some ups and downs did take place, such as the July 2010 suicide attempt when Plaintiff overdosed on lithium. (R. 332). However, Pontarelli told his treating physicians on numerous occasions that he was eager to find work. He stated to Dr. Boyanchek that he believed he could work 16 hours a week, and the psychiatrist released him to work part time. (R. 297-98).

**B.    Hearing Testimony**

Pontarelli testified at a hearing held before ALJ Dadabo on July 3, 2012. He stated that he was eager to work after he became sober in 2011. He spent up to two hours each

---

[1] The record suggests this may have occurred in June 2010 and that he was cared for by a Dr. Dekhtyar. (R. 255, 332). Nevertheless, the Court uses the ALJ's account for the purpose of this decision in the absence of any discussion of the issue by the parties.

day on his computer searching for jobs. Plaintiff was concerned about his ability to maintain work. He had been fired after only three days from a job delivering pizzas because he could not concentrate. He was also terminated from a temporary job for the same reasons. Pontarelli stated that his medications make him sleepy, and he fell asleep on a few prior jobs. (R. 30-32, 39, 42). Plaintiff claimed that his limitations stem from bipolar disorder and the medications that he takes to treat his symptoms.

### C. Medical Opinions

Dr. Ellen Rozenfeld issued Psychiatric Review Technique ("PRT") evaluation of Plaintiff on April 8, 2011. She found that Pontarelli suffered from bipolar disorder and a substance addiction disorder. Dr. Rozenfeld determined that Plaintiff had mild restrictions in his activities of daily living and had moderate limitations in social functioning and concentration. One or two episodes of decompensation were noted. Her mental RFC found no significant limitations in most areas, but some moderate restrictions were noted in Pontarelli's ability to understand and carry out detailed instructions, ability to interact with the public, and to respond appropriately to changes in the workplace. (R. 408-25).

Plaintiff's treating psychiatrist issued his own mental RFC on July 11, 2012. Dr. Gibbons also found that Plaintiff suffered from bipolar disorder and opiod dependence. His findings were more restrictive than Dr. Rozenfeld's. Dr. Gibbons concluded that Pontarelli suffered from marked limitations in several areas such as the ability to understand and remember detailed instructions, the capacity to work in close proximity with others, and the ability to complete a normal workday without psychological interruptions. Moderate restrictions were found in his capacity to sustain an ordinary routine without special supervision, to respond to changes, and to understand and carry out simple instructions.

Dr. Gibbons assigned Pontarelli a GAF score of 58. (R. 496-500).

Katrina Drummond, M.A., LPHA filled out a lengthy Comprehensive Mental Health Assessment on April 24, 2012 for the Kenneth Young Center. The ALJ noted some of her findings in the 28-page report. These included checking boxes stating that Plaintiff was clean, cooperative, had average eye contact, and was euthymic within normal limits. Other parts of the report state that he had a history of feeling depressed, hopeless, worthless, and that he was suicidal at times. His current suicide risk was low. Drummond also assessed Plaintiff's activities of daily living, finding few significant limitations in any area. (R. 462-89).

### D. The ALJ's Decision

ALJ Dadabo issued a written decision on September 26, 2012 that found Pontarelli to be not disabled. He found at Step 1 that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of October 30, 2010. At Step 2, Pontarelli was found to have the severe impairments of bipolar disorder and polysubstance abuse in remission. These impairments did not meet or medically equal a listing at Step 3, either singly or in combination. Before moving to Step 4, the ALJ assessed Plaintiff's credibility. He found that Pontarelli was not credible to the extent that his allegations conflicted with the RFC. The RFC included a full range of work at all exertional levels. However, non-exertional restrictions were added that limited Plaintiff to routine work in the same environment and no contact with the public. The ALJ then determined at Step 4 that Plaintiff was not able to perform his past relevant work. Based on testimony by the VE, the ALJ concluded that Pontarelli could perform jobs that exist in significant numbers. Accordingly, he found that Plaintiff was not disabled.

### III.  Discussion

Pontarelli challenges the ALJ's decision on three grounds.  He claims that the ALJ erred by: (1) incorrectly assessing his credibility, (2) rejecting the treating psychiatrist's opinion, and (3) failing to assess his RFC correctly.  The Court addresses each of these issues in turn.

### A.    Credibility

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work.  SSR 96-7p.  The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible.  The ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).  Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations.  *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  A court reviews an ALJ's credibility decision with deference and overturns it only when the assessment is patently wrong.  *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

Pontarelli objects to the fact that ALJ Dadabo did not carefully state the reasons for his credibility decision.  He relied instead on boilerplate language that Plaintiff's allegations were not credible "to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 16).  It is well-established that this language is insufficient to explain an ALJ's reasoning.  *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012).

Contrary to Plaintiff's assumption, however, "the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility decision." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013).

In this case, the ALJ went beyond the meaningless form language that Pontarelli cites. He found, for example, that Plaintiff had only mild limitations in his activities of daily living. A claimant's ability to carry out his activities of daily living is a factor that adjudicators are required to consider when assessing a claimant's credibility. SSR 96-7p. It is true that the ALJ's discussion of this issue was minimal. However, Plaintiff has not posed any objection to the ALJ's conclusion concerning his ability to carry out normal activities each day.

An ALJ should also consider the effects of a claimant's medication, together with the frequency and intensity of his symptoms. *Id.* The ALJ laid great emphasis on improvements that Pontarelli experienced on his medication. Plaintiff argues that this was insufficient because progress itself is not a basis for finding that a claimant can work full time. The Court agrees that the fact that a claimant's condition has improved, standing alone, is not necessarily evidence that he can work on a sustained basis. The more relevant question is what functional level the improvement yielded. The ALJ considered this issue by noting that Plaintiff's medications stabilized his bipolar episodes and gave rise to adequate control of moods, coping, and motivation. The ALJ also correctly linked these improvements to the absence of recent hospitalizations. (R. 14-15).

The record fully supports the conclusion that Plaintiff's bipolar episodes were significantly stabilized after he began treatment at the Kenneth Young Center. Numerous

treatment notes state that his mood and functioning had stabilized. (R. 319, 322, 348, 353, 361, 392, 403, 405, 457, 459). Less than two weeks after his alleged onset date, Pontarelli told Dr. Gibbons that "[t]his is the stablest I have been in a long time." (R. 403). He stated in January 2011 that he was "doing very well still." (R. 405). In February 2012, Pontarelli noted that he was "doin' pretty good" on his medication regimen. (R. 459).

Plaintiff claims that this does not support the ALJ's decision because he did not consider Plaintiff's allegations that the drugs that made him mentally stable also rendered him tired and sleepy. Pontarelli suggests that the ALJ's oversight of this issue is *per se* reversible error. That is incorrect. An ALJ is not required to specifically address each one of the credibility factors laid out in SSR 96-7p. *See Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999). Pontarelli's argument is particularly misplaced because Plaintiff himself repeatedly denied to his medical providers that he experienced any medication-related side effects. (R. 433, 441& 443 [noting only urination], 459, 494). Plaintiff counters this point by citing a list of side effects that his medications could have produced in theory. That falls short of demonstrating that he actually experienced any of them.

Pontarelli also argues that the ALJ did not consider that he had been unable to hold past jobs due to slowness and sleepiness. A claimant's attempts to work are relevant to assessing the severity of his symptoms. 20 C.F.R. § 404.1529(a). An ALJ errs when he fails to consider a claimant's past inability to hold jobs. *See Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014). The ALJ emphasized the fact that Pontarelli was actively looking for employment. He did not discuss Pontarelli's past jobs directly, however, other than to note that he once delivered pizzas.

This was not reversible error. The ALJ took notice of Plaintiff's concerns that he had

been unable to perform past work because he was too slow and sleepy. He also found that Pontarelli was "understandably anxious" about his ability to perform future work in light of his past experiences. (R. 16). The ALJ did not so much discredit Plaintiff's concerns as he disagreed that they were severe enough to prevent Pontarelli from working full time. The ALJ's reasoning concerning Plaintiff's improved mental state, combined with Plaintiff's denial of medication side effects, adequately supports the ALJ's reasoning on this issue. The Court cannot conclude that the ALJ's discussion is so devoid of evidence or logic that the entire credibility assessment must be reversed because it is "patently wrong." *Jones*, 623 F.3d at 1162. The Commissioner's motion is granted on the credibility issue.

**B. The Treating Physician Issue**

As noted earlier, Plaintiff's treating psychiatrist issued a mental RFC that found several marked and moderate limitations in Pontarelli's functioning. The ALJ gave the report little weight because he thought that it was not supported by the evidence as a whole, was marred by internal and "material" inconsistencies, and conflicted with an assessment issued by therapist Katrina Drummond.

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F.

Supp.2d 995, 1006 (N.D. Ill. 2008).

The ALJ's assessment of Dr. Gibbons does not meet this standard.  The ALJ relied heavily on the mental assessment that therapist Katrina Drummond issued.  The report did not measure Plaintiff's RFC, but it did assign him a GAF score of 58.  The ALJ's sole reason for preferring Drummond's opinion over Dr. Gibbons' was that Drummond's GAF figure "actually is more consistent with the documented longitudinal functioning" for Pontarelli.  (R. 17).  This fails to explain why Dr. Gibbons' report deserved little weight.  The ALJ overlooked that Dr. Gibbons assigned Pontarelli the same GAF score of 58 that Drummond did.  (R. 496).  The ALJ also assumed that a 58 score demonstrated functioning that contradicted Dr. Gibbons' belief that Plaintiff would experience a number of marked limitations in the workplace.  That is not necessarily true.  A score of 58 "suggests someone who may be barely above the level of being able to work or live independently."  *Goble v. Astrue*, 385 Fed.Appx. 588, 594 (7th Cir. 2010).  Even if the ALJ had noted Dr. Gibbons' score of 58, that would not necessarily have been a sufficient reason for rejecting the psychiatrist's marked limitations without more discussion than the ALJ provided.  An even higher GAF of 60 can be insufficient for discounting a bipolar claimant's "marked" limitations under certain conditions.  *See Sambrooks v. Colvin*, — Fed.Appx. —, 2014 WL 2700119, at *5 (7th Cir. June 16, 2014).

The ALJ's reliance on Drummond raises special concerns in this case because the ALJ used her report to discount *both* Dr. Gibbons and the SSA's own state-agency psychologist Dr. Rozenfeld.  (R. 17).  These were the only medical experts who gave RFC opinions about Plaintiff's mental functioning.  The ALJ concluded that Drummond showed that Pontarelli was less restricted than either of these experts believed.  Both Dr. Gibbons

and Dr. Rozenfeld were "acceptable medical sources" under the regulations. The ALJ seems to have assumed that Drummond was also an acceptable source because he claimed that she was a "psychologist/therapist." (R. 17). It is not clear how the evidence supports that assumption. No resume or C.V. in the record shows that Drummond was a licensed psychologist. A "therapist" is specifically excluded from being an acceptable source under SSR 06-03p.

Drummond signed her name as "Katrina Drummond, M.A., LPHA." (R. 489). The ALJ may have believed that Drummond's qualification as an LPHA meant that she was a psychologist. That is not necessarily true. An LPHA is a health care practitioner licensed in Illinois who can diagnose and recommend treatment concerning mental illness. This includes physicians, advanced nurse practitioners, clinical psychologists, licensed social workers, professional counselors, or marriage and family therapists. *N.B. v. Hamos*, — F. Supp.2d —, 2014 WL 562637, at *7 n. 7 (N.D. Ill. Feb. 13, 2014). Some of these professionals qualify as acceptable medical sources. Others, like licensed social workers, do not. *See* SSR 06-3p. An ALJ can always decide to give greater weight to a non-acceptable source than to a treating physician. *Id*. Nevertheless, the distinction between sources is still meaningful because "treating physician opinions and those of other examining physicians generally are given more weight." *Dogan v. Astrue*, 751 F. Supp.2d 1029, 1039 (N.D. Ind. 2010).

Whether Drummond qualified as an acceptable source or not, the ALJ was obligated to apply the same criteria to her that are used to weigh the opinion of a treating physician. SSR 06-3p. He overlooked this requirement entirely. The ALJ did not assign a weight to Drummond, or discuss any of the factors involved in such an analysis. He was required,

for example, to consider "[h]ow long the source has known and how frequently the source has seen the individual." *Id*. The record shows that Drummond was far less familiar with Plaintiff than Dr. Gibbons was. Treatment notes demonstrate that she only saw Pontarelli twice before issuing her assessment. The second time was on the same day as her April 24, 2012 report. (R. 448, 492). By contrast, Dr. Gibbons treated Pontarelli on numerous occasions over a period of years. Without following the guidelines set out by the regulations and Rulings, the ALJ had no basis for using Drummond's report to set aside both Dr. Gibbons' and Dr. Rozenfeld's more pessimistic views of Plaintiff's mental functioning.

The ALJ's other reasons for discounting Dr. Gibbons do not fare better. He thought that the psychiatrist's opinion was inconsistent with the record. The ALJ remarked that Dr. Gibbons' treatment notes stated that Plaintiff had an appropriate affect and clear thought processes. This fails to explain what inconsistency the ALJ thought he was relying on to discredit the treating psychiatrist. The restrictions that Dr. Gibbons' identified in his report were not all based on Plaintiff's affect and thoughts; they also included aspects of Pontarelli's social functioning, concentration, and memory. It was not inherently inconsistent for Dr. Gibbons to find that Plaintiff had good affect and clear thinking, but still suffered from restrictions in social functioning and concentration. Indeed, the treatment notes that the ALJ used as evidence of an inconsistency do not suggest that Dr. Gibbons intended to address these factors during his meetings with Plaintiff. The notes are more reasonably seen as assessments of Plaintiff's then-current moods and thoughts when the psychiatrist saw him for medication management. By contrast, the report was clearly intended to measure the full spectrum of Pontarelli's ability to engage in full-time work on

a consistent basis.

The ALJ provided no explanation of how he inferred from the treatment notes that Dr. Gibbons' RFC findings in the report were not credible.  A person can be fully oriented, have normal affect, think clearly and still be unable to maintain concentration for extended periods, or to work in close proximity with others without being distracted.  Dr. Gibbons might have believed that Plaintiff's improved functioning could not be sustained under the pressures of full-time work.  He might also have thought that Pontarelli's serious mental illness caused, or was accompanied by, cognitive and social limitations that were not noted in the treatment notes because they were not relevant to tracking the results of Plaintiff's medication management.  The problem is that the ALJ jumped to a finding without building a logical bridge connecting the record and his conclusion.[2]

The ALJ further believed that the report included an internal inconsistency because Dr. Gibbons stated that Plaintiff (1) could "perform activities within a schedule" but (2) could not complete a normal workday without psychological interruptions.  (R. 17).  The ALJ laid great weight on this point, finding that the two conclusions were "materially irreconcilable."  The Commissioner has not addressed this issue.  That may be because Plaintiff's ability to work "within a schedule" says little or nothing about his capacity to work full-time on a sustained basis.  The point is underscored by the fact that the box that Dr. Gibbons marked for "working in a schedule" did not include any specific time period for the schedule in

---

[2]  The issue is complicated by the fact that the ALJ's decision is based on a serious contradiction.  The ALJ gave Dr. Gibbons little weight.  He then included an RFC restriction that Plaintiff could not work in proximity to others.  This limitation could only have come from Dr. Gibbons' report because no other source mentioned it.  Indeed, the Commissioner concedes as much in her response.  The ALJ did not explain how he simultaneously rejected Dr. Gibbons' report *and* silently adopted one of its RFC findings.

question. A "schedule" does not necessarily involve a full eight-hour day. It could indicate short-term or medium-term activities. Dr. Gibbons might also have meant that Plaintiff could work within a structured framework if he were allowed to take periodic breaks. That is what Dr. Gibbons seems to have meant by finding that Pontarelli had a marked inability "to complete a normal workday and workweek *without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of length of rest periods.*" (R. 498) (emphasis added). The ALJ was required to explain his reasoning more carefully before finding that Dr. Gibbons' important limitation suffered from a fatal inconsistency.

The ALJ thought that Dr. Gibbons' RFC was also contradicted because Pontarelli admitted that his anxiety had been well-controlled on medication. The Commissioner is again silent on this issue. For its part, the Court sees no contradiction in the psychiatrist's reasoning. The ALJ's point could only be relevant to the expert report if Dr. Gibbons had based his RFC restrictions on Plaintiff's anxiety. Nothing in the report suggests that he thought that anxiety was relevant, or that he overlooked Plaintiff's improved symptoms. Dr. Gibbons was well aware that Pontarelli's anxiety-related symptoms had abated. (R. 454). Moreover, he never diagnosed Plaintiff as having an anxiety disorder. A more reasonable assumption is that Dr. Gibbons relied on Plaintiff's bipolar disorder. The ALJ was required to discuss the basis of his reasoning more clearly if he concluded otherwise.

Along the same lines, the ALJ also discounted the expert's opinion because the ALJ believed that lack of work was the real source of Plaintiff's daily stress. The ALJ's only support for this finding was a stray comment that Pontarelli made to Katrina Drummond in one of the two meetings they had prior to Ms. Drummond's report. The Court is again

unable to follow the basis of the ALJ's reason for discounting the expert report. Even if the ALJ's comment was substantively correct, he failed to explain why that undermined Dr. Gibbons' report. The expert report gives no indication that it was based on "stress" at all. Dr. Gibbons knew that Plaintiff was eager to work. (R. 446, 454). He simply thought that, even if Pontarelli found a job, he would still experience work-related limitations despite his desire to be usefully employed.

The same page from Drummond's report that the ALJ cited suggests why that might have been the case. Drummond noted that Pontarelli "has a diagnosis of Bipolar Disorder with [a] history of depressive symptoms including depressed mood, fatigue, social isolation, lack of interest, hopelessness, worthlessness, difficulty concentrating, neglect of role functions, recurrent thoughts of death, change in appetite and insomnia[.]" (R. 486). It is true that some of these symptoms had improved. But it is reasonable to assume that Dr. Gibbons thought that these formidable and long-standing issues could still have been a source of work-related problems. (R. 446, 454). Given Dr. Gibbons' expertise and familiarity with Plaintiff's mental health history, the ALJ should have considered that his RFC findings could not be dismissed by claiming that Plaintiff's only stress stemmed from lack of work.

Finally, and most problematically, the ALJ did not believe that Plaintiff's functioning was as restricted as Dr. Gibbons stated because of relatively high GAF scores that Pontarelli had previously received. The ALJ cited Drummond's score of 58 discussed above. He also noted that Dr. Yuan gave Plaintiff a 70 at one point and a 50 at another. The ALJ contrasted these scores with the assessment of 40 that both Dr. Gibbons and Dr. Boyanchek consistently gave Pontarelli in their treatment notes. The ALJ concluded that

these lower scores were inconsistent with "the normal or near-normal mental status observations of the psychiatrists and psychologists."[3]  (R. 16).

Substantial evidence does not support this line of reasoning.  GAF assessments must be approached with considerable caution when considering disability claims.  That is because "GAF scores are more probative for assessing treatment options rather than determining functional capacity and a person's disability."  *Warner v. Astrue*, 880 F. Supp.2d 935, 943 (N.D. Ind. 2012) (internal quotes and citation omitted).  *See also Jones v. Colvin*, — F. Supp.2d —, 2014 WL 657583, at *3 (N.D. Ind. Feb. 19, 2014) (noting that a GAF score is only a diagnostic tool that "is not the equivalent of a doctor's opinion of functional capacity and is not treated as such by the regulations").  Indeed, the latest version of the DSM "has abandoned the GAF scale because of its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Williams v. Colvin*, — F.3d —, 2014 WL 2964078, at * 2 (7th Cir. July 2, 2014) (internal quotes and citation to the DSM-V omitted).

Contrary to these guidelines, the ALJ relied on GAF scores as signs of Plaintiff's long-term functional abilities.  He clearly assumed that a score given at one time could be used to support or contradict findings concerning Plaintiff's mental condition years later.  That was the basis of his belief that a score of 70 given in February 2010 contradicted a score of 40 given as late as May 2012.  However, GAF scores often fluctuate.  *Hunt v.*

---

[3]  It is not clear who the ALJ meant to reference by this comment.  Dr. Yuan was the only psychiatrist other than Dr. Boyanchek and Dr. Gibbons that the ALJ cited.  As noted, there is no evidence that Ms. Drummond was a licensed psychologist.  The Court assumes below that the ALJ intended Dr. Yuan to be the psychiatrist that showed "normal or near-normal mental status."

*Astrue*, 889 F. Supp.2d 1129, 1146 (E.D. Wis. 2012). The record in this case vividly illustrates that point. Pontarelli's scores vacillated from a low of 20 to a high of 70 in a matter of days. That is hardly surprising given that Plaintiff suffers from bipolar disorder "with rapid cycling." (R. 311). The ALJ should have been aware that a bipolar claimant's GAF scores could be expected to fluctuate in line with the varying mental states that are part of his condition. Courts have been clear that these variations can be anticipated even when a claimant receives proper medical treatment. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) (noting that bipolar disorder "is by nature episode and admits to regular fluctuations even under proper treatment").

Notably, the Commissioner dissociates herself from the ALJ's reliance on GAF scores. She states that the multiple assessments of 40 that Dr. Boyanchek and Dr. Gibbons assigned were merely given on "a blanket basis regardless of [Dr. Gibbons'] substantive findings." (Resp. at 8). That is reason in itself to reject the ALJ's contrary assumption. Moreover, the Commissioner goes on to argue that the GAF scores should not be given special attention at all because they are not directly correlated with the severity of a claimant's impairment. The Court agrees, though the Commissioner's point undermines much of the ALJ's reasoning.

GAF scores are not irrelevant to an ALJ's decision. But courts have rejected again and again the notion that GAF scores are anything other than momentary "snapshots" of a claimant's functioning that cannot be used to assess an individual's overall functioning. *See*, *e.g.*, *Sambrooks*, — Fed.Appx. —, 2014 WL 270019, at *5; *Macklin v. Colvin*, 2013 WL 5701048, at *10 (S.D. Ind. Oct. 18, 2013) (noting that GAF scores are "clearly not indicative of [a claimant's] ability to function on a day-to-day basis"); *Doyle v. Astrue*, 2012

18

WL 489146, at *6 (N.D. Ind. Feb. 14, 2012) (discussing GAF scores as snapshots of a claimant's condition rather than signs of progress); *Granados v. Astrue*, 2011 WL 746285, at *7-8 (N.D. Ill. Feb. 24, 2011); *Chinderle v. Astrue*, 2011 WL 4396914, at *6 (N.D. Ill. Sept. 20, 2011).

The ALJ's emphasis on GAF scores led him to unsubstantiated conclusions. He assumed that the score of 40 that Dr. Boyanchek and Dr. Gibbons assigned as late as 2012 was refuted by Dr. Yuan's GAF scores of 70 and 50 that were given in 2010. The ALJ certainly provided no other reason for contrasting Dr. Gibbons' score with the "normal and near-normal" findings of other experts. The Court cannot follow how Dr. Yuan's scores can reasonably be construed as signs of sustained normal functioning that the ALJ was entitled to use to discount later (and lower) GAF scores. The record illustrates the problem in somewhat dramatic terms. Dr. Yuan rated Plaintiff at 70 when he was released from the hospital in February 2010 after being treated for a suicide attempt. Only six months later in July 2010, Pontarelli was hospitalized once more when Dr. Yuan feared that he might again try to kill himself. Thus, the 70 figure is not even reliable evidence of Plaintiff's functioning on a relatively short-term basis, much less an indication that Dr. Gibbons was incorrect years later in his 2012 report.

The ALJ acknowledged Plaintiff's second hospitalization for suicidal ideation. Instead of construing it as a sign of ongoing problems, the ALJ concluded that the fact that Dr. Yuan gave a 50 score upon admission meant that Plaintiff only had "moderate" restrictions. As before, the ALJ seems to have thought that this was counter-evidence to Dr. Gibbons' later assessments. This was seriously erroneous. One problem is that the ALJ mischaracterized the significance of a 50 GAF score. Only figures between 51 and

60 indicate "moderate" limitations. A score of 50 represents "serious" symptoms. *Pyle v. Colvin*, 2013 WL 3866730, at *7 (N.D. Ind. July 15, 2013). "A GAF rating of 50 does not represent functioning within normal limits. Nor does it support a conclusion that [a claimant] was mentally capable of sustaining work." *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010). *See also Granados*, 2011 WL 746285, at *7 (noting that 50 can indicate suicidal thoughts "or any serious impairment in social, occupational or school functioning, such as being unable to hold a job").

Moreover, the ALJ's reasoning would fail even if he were correct that a score of 50 indicates moderate symptoms. ALJ Dadabo implicitly used Dr. Yuan's scores of 70 and 50 as evidence that Plaintiff's 2010 hospitalizations – both of which constituted serious episodes of decompensation – were not inconsistent with his negative view of Dr. Gibbons. The Court can see no other reason why the ALJ focused on Plaintiff's hospital-related GAF scores to discount Dr. Gibbons rather than discussing Plaintiff's decompensation more fully. The ALJ was correct that the 70 figure suggested that Plaintiff was functioning "pretty well" (R. 16) upon release from his first hospitalization. It is also the case, however, that he had just attempted to kill himself, and that Dr. Yuan hospitalized him within six months because he feared Plaintiff would try again. It goes without saying that persons with normal or near-normal mental functioning are not ordinarily hospitalized as potential suicide victims. The ALJ should have considered that GAF scores of 70 and 50 given in the context of suicide-related hospitalizations are not the best indicators of a claimant's subsequent mental functioning.

The ALJ must explain in greater detail how Dr. Gibbons' assessments (whether in terms of the GAF scores of 40, or the expert report) are inconsistent with what the ALJ

20

thought was Pontarelli's relatively normal mental state.  Plaintiff's motion is granted on this issue.

### C.    The RFC Issue

The ALJ found that Pontarelli could work if certain non-exertional restrictions were put in place.  These included routine work in the same environment each day.  Plaintiff was further restricted to situations in which he primarily works alone, has no public contact, and is not required to engage in team coordination.  Pontarelli argues that the ALJ's reference to "routine work" does not sufficiently account for his limitations in concentration, persistence, and pace.  The Commissioner argues that the ALJ provided for these restrictions by including additional limitations that prevent Plaintiff from working with others or from having contact with the public.

It is well-established that restricting a claimant to "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not adequately account for restrictions in concentration, persistence, and pace.  *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009).  The Commissioner has not presented any authority for the claim that additional restrictions like working alone and performing tasks that remain the same alter this conclusion.  Instead, the ALJ cites *Parrot v. Astrue*, 493 Fed.Appx. 801, 805 (7th Cir. 2012).  That case only states that a hypothetical question that excludes complex tasks is sufficient to account for moderate restrictions in concentration.  That is not the same as arguing that working alone and performing repetitive tasks carry the day.  It is not even clear how working alone relates to concentration.  It could just as easily be designed to account for Plaintiff's restrictions in social functioning.

Notwithstanding, the Court does not address this issue in detail.  The ALJ's RFC

requires remand even if the Commissioner's reasoning is correct. An ALJ is always obligated to discuss how the evidence supports his RFC restrictions. He must also describe how he resolved any inconsistencies in the evidence. SSR 96-8p. In this case, the ALJ Dadabo failed to provide any explanation of how he reached his conclusions concerning Plaintiff's non-exertional restrictions.

The ALJ did not cite any medical evidence to support his RFC. He gave little weight to Dr. Gibbons. He also failed to take note of Dr. Rozenfeld's PRT other than to state in passing that Drummond's report convincingly showed that Plaintiff was less restricted than Dr. Rozenfeld believed. But the ALJ gave no reason for giving greater weight to Drummond, nor did he explain what part of Dr. Rozenfeld's PRT was erroneous. That is especially problematic in light of the fact that Drummond did not even make an RFC assessment. The ALJ was required at least to cite the state-agency psychologist's findings, and to discuss them in some minimal way, before he could reject them.

Even if he had relied on Dr. Rozenfeld, moreover, the ALJ could not have used the PRT to support his finding that Plaintiff should be restricted to working alone. Dr. Rozenfeld did not include that limitation in her RFC assessment. To the contrary, she stated that Pontarelli "would be *able* to work in proximity with others but not on joint/shared tasks." (R. 424) (emphasis added). As the Commissioner notes, the ALJ seems to have taken this restriction from Dr. Gibbons, even though he gave little weight to the expert report. The result is contradictory and unexplained: the ALJ both rejected and accepted parts of Dr. Gibbons' report, discounted Dr. Rozenfeld's, and then constructed an RFC without drawing a link between his findings and the record.

The absence of an adequate discussion of how the ALJ reached his RFC requires

remand.  An ALJ is not permitted to create a "middle ground" RFC without a proper medical basis and without an explanation of how he reached his conclusions.  *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011); *Bailey v. Barnhart*, 473 F. Supp.2d 822, 838-39 (N.D. Ill. 2006); *see also Newell v. Astrue*, 869 F. Supp.2d 875, 891 (N.D. Ill. 2012); *Pulaski v. Astrue*, 2012 WL 1932113, at *11 (N.D. Ill. May 25, 2012).  On remand, the ALJ shall explain how the record supports each of the limitations included in the RFC.  Plaintiff's motion is granted on this issue.

## IV.  Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment [14] and the Commissioner's motion for summary judgment [22] are both granted in part and denied in part.  The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.


**ENTERED:**

**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: July 7, 2014.